is á bill to obtain a perpetual injunction against judgment at law, or such relief as the complainant be entitled to.
The bill stated that the complainants were merchants trade at Boston, and had a branch of their house at Charleston, S. C. That Nathaniel Tracy, also a merchant, applied to the camplainant, T. L.. AVinthrop, to engage his house at Charleston, to ship to Lane, Son an(j Frasor 0f London, 1700 barrels of rice, on account and risk of said Tracy and his assigns, on the usual terms ; he agreeing to furnish the funds in time to pay for the rice. That T. L. AVinthrop agreed to the pro-_ ^ , . ,, posai, and on the 21st of October, 1785, signed two aSrcements to that effect. See exhibits A. and B. That at the same time Tracy signed two obligations, by wliifch (after reciting that he had already advanced cornpja¡nant nearly S000Z. sterling,) he engaged to pay L. AVinthrop 3000?. sterling, or so much as might be ^u8 ^01’ ^10 1700 barrels of rice, to be paid in time to purchase the rice. See exhibits C. and D. That the advances so spoken (and erroneously stated as sterling,} were n°tin money» butin shipments of New-England consigned by Tracy to complainants at Charleston, which they were obliged to sell on a credit, and coub* not collect the money in time to make the full ship- *311 jnents of iice, and was quite insufficient for that pose. That afterwards the said Tracy requested T. L. Winthrop to sign acceptances of orders, on the backs, of the said contracts, agreeing to deliver the rice to' 00 ' Lane, Son and Fraser, and the said T. L. W. not supposing such accceptances could vary the situation of the business, or make his house liable, but according to the contracts themselves, did sign an acceptance, under each of said contracts, whereby it was agreed that the rice should be delivered to Lane, Son and Fraser. See ■exhibits A. and B. That th,e impossibility of collecting the money on the sales of the rum prevented the complainant’s shipping the rice so soon, or to the extent agreed. But they did ship a part of the rice, with other Articles, to Lane, Son and Fraser, for which complain-, ants suppose ; Tracy has credit with them. That Tracy also consigned the brigantine Lucy to complainants -at Charleston, with orders to Load her with rice, to be addressed to Mr. Bouletlneare, merchant at L’Orient, with orders if complainants were not in cash, for articles previously consigned to them, to draw for the amount of the cargo on him, or on iiis friends Coxe and Donaldson, of Philadelphia. See Tracy’s letter of 12th April, 1786 ; Exhibit E„ That complainants shipped accordingly by the Lucy, 434 whole, and 109 half barrels of rice, and 21,131 staves, of the value of 38011. See exhibits F. and G. And to reimburse themselves they drew bills on Coxe and Donaldson, as directed by Tracy : but they, by his express direction, protested the bills, which with damages and interest amounted to 31-851.-sterling. See exhibits 1 to 7. Thus injured by Tracy’s conduct, complainants were compelled to stop shipping the riceio Tracy’s correspondents in London, and to retain in their hands the funds sent them by Tracy, on account of the prior contracts, to, repay them in some measure for the losses sustained by the above protests, and a debt of 17001. also due by Tracy to complainants. Tracy transferred the two original contracts for rice, to Lane, Son i^id Fraser, or some agent of theirs, and af~ *312 forwards became bankrupt. Complainants did not expect that any demands would be made on them by Lane, Son and Fraser, whom they considered as the agents of r^racJ'‘ But they soon made a demand and instituted a suit on account of said contracts, in the Court of Corn-mon Pleas in this State, and though they had never paid a cent for said rice, and the papers were not negotiable, they recovered a verdict, in 1790, for the sum of 54771. 8. That Tracy is dead, and several of the house of Lane, Son and Fraser. The complainants contend that Traey had no right under the circumstances to transfer their obligations; and they charge that the papers re» mained in Tracy’s hands till about the time of his failure. That Tracy was the real principal, and continued to direct and manage the business, and never intimated to complainants that they were responsible only to Lane, Son and Fraser, or complainants would never have made the shipment to France as directed by Tracy. See letters of 14th and 30th Sept. 1786 ; exhibits I. and K. That Lane, Son and Fraser were not pi-ivy to the original contract, nor did they pretend they were the real owners thereof till Tracy failed; nor did they debit complainants therefor; nor open any account with complainants in their books, as they would have done if they looked to them for payment; nor did they give notice to complainants that they held the same in their own right till Tracy’s failure j nor did they give Tracy va-Jueable consideration for these obligations, but received them merely as a collateral security, being apprised of and liable to the equity of the complainants’s claims against Tracy j and not as an absolute transfer, but a mere deposit for Tracy, and at his risk, as appears by the receipt given by G. Dickenson, their agent, to Tracy, dated November 5,1785, by which he acknowledged that he received the obligations from Tracy, the shipments of rice were to be made on the account and risk of Tracy, and promises to carry the nett proceeds to Tracy’s credit, in account with Lane, Son and Fraser, and by a memorandum dated 13th of October, 1789, in *313 which striking a balance between Tracy and Lane, Son and Fraser ; they give them no credit for the amount of the contracts, but merely note them as depending matter. See exhibits L. and M. The bill concludes by praying for perpetual injunction and full relief.
The answer of John Lane, the survivor of Lane, Son and Fraser, admitted the contracts as stated in the bill, and the endorsements and acceptance, as stated.
Defendant believes Tracy delivered the two promissory notes or contracts, to G. Dickinson, the agent of Lane, Son and Fraser, towards the discharge of the balance due by Tracy to them, then amounting to 1TT681. sterling.
Defendant admits that complainant did remit in part of that contract, 168 barrels of rice, the neat proceeds of which, being 805J. were carried to the credit of Tracy, in account with Lane, Son and Fraser. Defendant has heard and believes that Tracy sent the brig Lucy to Charleston, with orders to Messrs. W. T. and W. to ship rice to France. But they are ignorant of all the transactions which took place, of the shipments, bills of exchange and protests. And they deny that the misconduct of Tracy justified complainant in neglecting to fulfil the contracts then fairly held by defendant. Defendant is ignorant if Tracy was then in arrear to complainants, or in desperate circumstances. But has heard and believes that Tracy about two years afterwards became embarrassed and avoided his creditors. Defendant insists complainants are bound to comply with their contracts for the 1700 barrels of rice, transfered fairly with the knowledge of T. L. Winthrop to the defendants j and defendant believes that Tracy did furnish funds sufficient to purchase said rice 5 though they may have advanced money for him, in the shipments to France j and though they may have suffered by his protesting their bills. Defendant submits that the agreements of Tracy with complainants were not contained in the contracts, which were endorsed and transferred to Lane, Son and Fraser, and they had no noti^e ef ,su?h agree* *314 merits. And they had a right to recover on those agreements, those papers beingtransferrable and negotiable, and Tracy largely indebted to them $ and they took them? discharged of all tlxe equity-they might have been liable to in Trácy’s liánds. Defendant admits, that L'ane, 'Son and Fraser brought suit as'stated in the bill, and recovered judgment' theteon to the amount of 54771. Defendant is advised that Tracy had a "legal right to endorse and transfer the said contract, and believes said endorsement was made with the knowlege and consent Of said T. L. Winthrop, and that no fraud was prac-tised on him. Said contract were endorsed and delivered to Dickinson the agent of Lane, Son and Fraser,at least as early as October, 17’8&, for defendant‘then saw them in his ^possession, having 'been prior to' their execution, and received them in part payment of a "debt of Tracy to defendant, and defendant believes that as soon'as 168 barrels of 'rice Were 'received in London, which Were sent by-Complainant in part performance or the contract, they were so'ld and the proceeds credited to Tracy by-Lane, Son & Fraser, & defendant does not know if Tracy preténded'to be still interested in said contracts, and to manage the business, but admits he may -have written the-letters stated by complainant in September 1786. Defendant admits that Lane, Son and Fraser did not'send :any vessel for the rice, because by such contract it was to -be shipped by complainants in vessels to be sent them by Tracy. Defendant admits that he did not give any notice of the transfer of the contract to . ■Lane, Sen and Fraser, nor was it necessary as T» L. Winthrop knew they were so delivered and transferred. Defendant denies as far ás he knows that Tracy used the names of Lane, Son and Fraser in the transfer of said orders to protect his property from attachments. Defendant denies that Dickinson the agent knew or accepted the contracts subject to any equity existing between complainant and Tracy. Defendant admits that Dickinson gave such receipt to Tracy, as in bill mentioned, and that Lane, Son .and Fraser in their ac *315 .count of October, 1789, struck a balance without crediting him with the said contracts. Defendant insists that he ought not to be enjoined,. &c.
At the trial of the cause the complainants! counsel produced and read in evidence the exhibits; marked A. and B. Exhibit A. is in these words.: « For value received, Boston, 21st October, 1785, I promise in behalf of Winthrop, Todd & Winthrop,¡merchants of Charleston, S. C. to ship on account and risk of Nathaniel Tracy, Esq. or his assigns, one thousand tierces, of rice in all the month of December ; or so soon as the new rice comes to market, in any vessel or vessels he or they may direct the same, to be addressed to Messrs, Lane, Son and Fraser, in London.
(Signed,) “ Thos. L. Winthrop.”
On the back of this paper were these words : « Deliver the within mentioned rice to Messrs. Lane, Son and Fraser, or order.
(Signed,) Nath. Tract.”
Also, the following words : “ Accepted to deliver the ■within as above in behalf of Winthrop, Todd and Winthrop. .
(Signed,) « Thos. L. Winthrop.”
Exhibit B. is of the same date, and exactly similar to the above, except that it is for 700 tierces of rice, to he shipped in all February, then next following, with similar endorsements. The exhibits C. and D. were also read. C. is in these words : « For value received, Boston, October 21, 1785, I promise to pay Thomas L. Winthrop, or order, in behalf of Winthrop, Tbdd and Winthrop, merchants of Charleston, S. G. 1000L sterling, or so much as may be due to them, for the 1000 tierces of rice, they, by their obligation of this date, are to ship for my account in' all the month of December next, the same to. be paid them in time to purchase the said rice, having advanced them nearly 2000k sterling, towards the purchase of the said rice.
(Signed,) “ Nath. Tracy,”
*316 On the hack of the above is the fallowing receipt:: “Boston, February 4, 1786, received of N. Tracy 1069?. 5s. L. M. being the amount of 100 hogsheads of N. E. rum, shipped in the brigantine Swallow, Sam. jjdweyerj master, for account of Messrs. Winthrop, a«d Winthrop, payable three months after date in part of the within obligation.
Signed for W. T. and W.
Thos. L. Winthrop.”
1069?. 5s. L. M.”
Exhibit D. is of the same date, to wit: “31st October, 1785,. and exactly similar to the exhibit C. only that it is for 2400?. or so much as the amount of 70Q tierces of rice may be, which they are to ship in all February, then next following ; the said sum to be paid in time to purchase the said l’ice, and security to be given to the said Winthrop, whenever he may require tho same.”
Signed by Nath. Tract.”
On the back of this paper is the following receipt: <« Boston, December 29, 1785, received 1080?. 6s. of L. money, in part of the within note, being the amount of rum shipped on the brig Mary, Captain S. Pierson.
(Signed,) W. T. & W.
“ By Thos. L. Winthrop.”
“ 1080?. 6s. 8d.”
“ N. B. The above mentioned rum was payable in three months from the above date.
(Signed,) “Thos. L. Winthrop.”
Exhibit E. Mr. Tracy’s letter to W. T. and Winthrop of 12th April, 1786, authorising them to draw on Donaldson and Coxe, of Philadelphia, to pay for certain shipments ordered by him to be made to France by the Lucy.
Exhibit E. E. Letter dated October 7, 1786, from Donaldson and Coxe, stating that they were obliged to refuse their bills, by orders of N. Tracy, except one of about $ 600.
F. is the invoice of the brig Lucy, of 15th September!» *317 .1786, of shipments made by W. T. and W. to France, by order of N. Tracy, and on Ms account.
G. bill of lading, of cargo shipped on board the Lucy, 15th September, 1786.
H. is an account current shewing N. Tracy to be indebted to W. T. and W. in 1700Í.
Account begins 1st January, 1786, and closes 19th of October, 1786.
I. is a letter of N. Tracy to Thomas L. Winthrop, dated September 14, 1786. Answer 20 Sept. 1786.
Another letter from N. Tracy to W. T. and W. 1st December, 1785, by brig Mary, states the shipment of 200 hogsheads of N. E. rum, shipped on their account and risk. Directs shipments of rice to Lane, Son and Fraser.
K.. Letter. Tracy to Thomas L. W. Sept. 30, 1786, expresses surprise that the rice was not shipped on his account.
L. Account current between Lane, Son and Fraser, and N. Tracy. Newberry, October, 1789. 1st. item, 30 April, 1787; last item, 30 October, 1789. Brings forward balance of old account, 53,1491. Balance due by Tracy to Lane, Son and Fraser, 15,369i. 18s. 7d. This is the document alleged to have been discovered since the trial at law. It is at the foot of this account that a special note is made relative to the contract of Winthrop, T. & W. for 1700 barrels of rice, and states it as depending, and gives no credit for it.
M. is the receipt of Mr. Dickinson, agent for Lane, Son and Fraser, for two obligations, signed by W. T. and Winthrop to Tracy for 1700 barrels of rice. The following is the copy : « Boston, Nov. 5, 1785 — This day received of Nath. Tracy, two obligations signed Thomas L. Winthrop in behalf of W. T. and W. one for the shipment of 1000 barrels of rice in December next; the other for 700 barrels in February next, both of which said Tracy has assigned to Lane, Son and Fraser. He is to send vessels to receive the same, and though it will be shipped by the above mentioned gen *318 tlemen on account and risk of Lane, Son and Fraser, it *s notwithstanding to be on the proper account and risk of Mr. Tracy : I do therefore engage that the proceeds S*ia^ Passe^ his credit, in account with Lane, Son and Fraser.
(Signed,) “ Geo. Dickivson.”
This also was pai’t of the evidence discovered since the trial at law.
Jt.ought to be noticed that the answer generally denies any knowledge or acquiescence in any of the facts which the complainants charge and rely on for discovery and relief; except that it admits that Mr. Geo. Dickinson was the agent of Lane, Son and Fraser, and that the shipments were made by W. T. and W. on the ' account and at the risk of Nath. Tracy, though addressed to them, and that they did not give Tracy credit for the amount of the 1700 barrels of rice, nor did they debit W. T. and W. with them, but credited Tracy with the nett amount of the shipments actually made by W. T. and W. to them.
This cause was argued with great ingenuity and . ability on both sides, and the Court is greatly indebted to the counsel for the light thrown upon the cause. The principal arguments used, will be adverted to in the course of the opinion which the Court is about to give.
The first ground taken by the defendant, was, that the judgment at law was conclusive, and that this Court not being a Court of Appeals, cannot reverse that decision. It certainly.is true that the Courtis not a Court of Appeals, and it would never entertain a suit, which claimed its interposition merely on the ground that on a trial at law, where the merits were fully disclosed, justice had not been done.
The complainants, however, insist that this is not the ground of their application. They contend that the whole truth did not come out, and that facts have been discovered since the trial at law, not then within the knowledge or power, of the complainant, and fully with *319 in the knowledge of the present defendants, (then pl’tffs) •which if known would have materially altered the case, and obtained a different decision.
’ This makes it necessary to examine the case which was made at law, and the decision thereon, and to compare it with the case now made. The case is. reported by Mr. Justice Bay in the 1st vol. of his reports, p. 113. It is there stated that the suit was brought upon the acceptance of Thomas L. Winthrop on behalf of W. L. and Winthrop, which was endorsed on the back of the two obligations of W. T. and W. to ship rice on account of Tracy to Lane, Son and Fraser.
The obligations, the endorsements by Tracy, and the acceptances by Thomas L. W. forW. T. and W. are •stated to have been given in evidence. No other evidence is mentioned in the cause.
It was insisted for the defendants on the trial that the assignee or person in whose favor the endorsements and acceptances were made, could not maintain the action ; because the obligations were not negotiable, and .because there was no value expressed to induce the endorsement and acceptances: therefore it was nudum pactum.
Only one of the counsel glanced at the principal ground now taken, to wit, that the plaintiffs, Lane, Son and Fraser, were the agents of Tracy. And this, he urged not upon any facts disclosed in the cause, beyond the endorsements and acceptances; bat on the ground, that as no consideration was expressed, (which would have been the case if a new contract had been intended,) it was nudum pactum. Therefore the obligations still remained the property of Tracy, and Lane, Son and Fraser were only his agents. That the obligations not being negotiable, Tracy could assign no more than his interest; subject to all the equity of'the other party; which equity they were, however, attempted to be precluded from by the form of action.
On the other side it was contended that there can be no nudum pactum, where the contract is in writing. *320 That the suit was not on any implied assumpsit or any assignment, but on the express undertaking of the de« fendants by their acceptances on the back of the obligations after the assignment made : not on the supposed negotiability of the paper, but on the express assumpsit ^y ^,e defendants themselves, which formed a new contract.
The able judge who presided was of opinion, that this was a new contract which the parties had a right to make on the baclt of the old contract; and this suit being brought on the new contract, which created an original right, no equity between the original parties could be set up.
It was urged that froni this statement of the cause tried at law, it appears that the evidence now brought to the view of the court and the grounds founded thereon, were not before the court below, and being discovered since the trial entitles, the party to relief in this court,
1. This involves the necessity of enquiring what the new evidence is; and when it was discovered and if there are any objections to its reception ?
2. If the new evidence varies this cause from that tried at law, so as to warrant the interposition of this court ?
3. Whether the case now made entitles the complainants to any and what relief ?
The evidence now disclosed, which does not appear to have been before the Court below, is various. It consists of several letters between Tracy and ,W. T. and Winthrop, and from the latter to Lane, Son and Fraser* shewing that subsequent to the endorsements and acceptances, Tracy still continues to order, direct and treat the contract as his own ; and that W. T. and W. still Considered him as the real owner, even in their correspondence with Lane, Son and Fraser. And that Lane, Son and Fraser did not interfere, or appear to claim as owners, until after Tracy's failure.
If this had been the whole of the new testimony pro *321 duced, and if it had been more conclusive to the point, to establish which it was introduced, it would still be liable to the strong objection made by the counsel for the present defendants, that the party against whom the judgment was rendered at law, could not come into this Court for relief upon evidence, which he possessed and might have produced on the trial at law. For most if not all of these letters were within the power of the party at the time of the trial at law, and if he did not make use of them then, it was his own fault. Other testimony, however, is now produced, which it is contended by the complainants is material to the justice of this cause, and which they had no knowledge of, and could not then obtain, which entitles them to claim the interposition of this Court, and to relief.
The first testimony of this description is the receipt of George Dickinson, the agent of L. S. and F. to Tracy for the two obligations of W. T. and W. dated 5th November, 1785, a few weeks after the date of the obligations.
The second is the account between Lane, Son and Fraser and Tracy.
There is no evidence that this testimony was within the power of the defendant at law, at the time of the trial below. The transactions were between Tracy and Lane, Son and Fraser. They knew what had taken place between themselves on this subject $ but W. Tf and W. do not appear to have known or suspected the existence of these papers. The non production of them at the trial at law, where they might have been beneficially used in their defence, furnishes a strong presumption that they had them not in their power, and were even unacquainted with their existence. The hill charges that these have been discovered since the trial at law, and the plea admits this allegation. But it was insisted by the counsel for the defendants in this suit, that W. T. and W. might have obtained the knowledge of these papers, or of the facts disclosed by them, if they had used due diligence, by sending commissioners to examine *322 Tracy or llis clerks, and L. S. and F’s clerks. And that if they neglected to do this, they are not now at li-herty to Use this testimony.. Undoubtedly it is true, that ^ a Pai’ty does not use reasonable 'diligence to obtain testimony material to his cause, it is'a neglect for which must su/ter. And he shall not be allowed to renew the litigation, on pretence of the discovery of new evidence, which he ought to have obtained before the first trial. But this rule itself has reasonable limits. The testimony niust have been within the. knowledge of the party, or lie must have had some clue to guide him in the search before he.can be said to have neglected the proper steps to obtain it. There is'no reason to believe that the party had knowledge of the existence of the particular documents in question. And there is no reason to suppose that they had any distinct idea of the true nature of the transactions between L. S, & F. and Tracy beyond the endorsements and the acceptances. And if they had any vague ideas on the subject, arising from 'theletters, and conductor Tracy, of whom were they to seek this testimony l- Lane, Son and Fraser were parties. Tracy was a party in interest, and would not be likely to disclose what he knew. The parties all lived in different parts of the world. In short I think the objection'too broad. It would impose on parties who come to this Court'for relief on the ground of the disco-of new and material testimony, the obligation fo shew that theyhad sent abroad at a venture ambulatory commissions in search Of testimony.
I am therefore of opinion that the new testimony produced in this cause is properly admissible, and upon '■which the complainant can come here for relief.
'The next question is, whether the new testimony varies the case from that made at the trial at law, so as to warrant the interposition of this Court. I presume ' there is little difficulty in deciding that the case is importantly varied. The receipt signed by Mr. Dickinson •to Mr. Tracy for the two obligations of W. T. and W. '"to-ship the rice, states that notwithstanding the assign- *323 anent of. those obligations to Lane, Son. and Fraser, the rice was in reality to be on the account and at the risk of Tracy; and that he should be credited with the nett proceeds when received..
The account current betweenL.,S.,and F..and Tracy, is dated 12th October, 1789, and shews that the did not give credit to Tracy for. the amount or value the 1700 barrels of. rice, contracted to be shipped by them, on account of Tracy, and addressed to Lane, .Son and Fraser, and. notes those contracts as depending and unfulfilled ; and they by so noting it on the face of the account, shew that, they still looked to .him, and they o-s pened no new account, with V, T. and W.
This is certainly a very different case from that made, on the trial at law; and it might have had a very diffe-. rent decision there, if all these facts, had.come out on the trial.
To this testimony may be.added the discovery, in.the answer corroborating, the preceding. But does the variation so. made by the new testimony, warrant the interposition of this Court ? It must be remembered that the great objection is that this.Court is not a Court of Ap-' peals, and cannot reverse a judgment at law, when the • merits of a. cause, have been decided there. This is adr mitted; but it is said in answer that where the merits have not been fully tried, where new matter,, not then known or within the power of the party to; produce is now obtained, which greatly varies, the original case,, this Court may and is bound to- interpose, in order that complete justice may be done to the citizen.
Happily the Court is not left to grope its way in the dark, or to exercise a vague discretion on this subject.
The decisions of able Judges are at hand to assist, our judgment.
The general powers, of this Court áre very great; and amongst others it is assistant to the Courts of law in counteracting fraudulent judgments; or where in *324 conscience and equity the plaintiff ought not to avail himself of a judgment at law.
I*1 the case °f the countess of Gainborough v. Gifford, reported in 2 P. Wins. 424, it is laid down that a Court of Equity will give relief in a matter where the defcn-dant at law might have defended himself, as if plaintiff at law recover a debt at law, and the defendant af-terwards discovers a receipt under the plaintiff’s own hand for the money in question. There the plaintiff recovered, at law against conscience, and though the receipt was in the defendant’s custody, yet he not being then apprized of it, seems entitled to the benefit of equity. So if the plaintiff’s own booh appeared to be crossed, and the money paid before the action. So if other circumstances shewing injustice done by the verdict at jaw, by surprize or accident, or I may add ignorance, as in the very case reported.
The great abuse which might take place under this doctrine, by drawing within the jurisdiction of this Coiud, as by a side wind, almost all causes decided at law, has made the chancellors extremely cautious and even reserved in the use of it. Well knowing that the high powers with which they are entrusted, are to promote the purposes of justice, and do not give a wild, unsettled discretion; they are anxious these powers should not be abused to the vexation of the citizen and the unsettling solemn decisions of other courts, where full justice has been done. Thence we find the Chancellors extremely guarded in their expressions as to the exercise of this power.
Lord Redesdale (late Mr. Mitford) says Courts of equity will not interfere after verdicts at law, unless in eases of fraud, surpise, or extraordinary cases, where manifest injustice has been done. See new Reports by Schoalesand Lefroy, 1 vol. 201.
Nor will they interfere after verdict at law, where the party might have defended himself at law, or where the party might have been competent to lay before the jury or courts on motion for new trial, the grounds on *325 •which he apifiies to the Court of equity for relief. New Reports by Schoals and Lefroy.
Lord Harwicke also says, the Court will not always relieve against a verdict, where the defendant submits to try it at law first, when he might by bill of discovery have come at the fact by the plaintiffs’s answer, upon oath, before any trial at law was had. See Williams vs. Lee, 3 'Atk. 223 4.'*
The doctrine seems to be comprised in these cases. Take the rule then with its modifications and reserves, and apply it to the case before us. Here is new testimony not within the knowledge or power of the complainant, which was well known to the plaintiffs at law, the present defendants, which has been discovered since the trial at law, and too late to lay before the Court on motion for new trial; and which alters the case materially and probably would have produced a different decision, if it had been known in time, and adduced at the trial.
*326 ® *s an extraordinary case where the parties defend-a»ts at law, could not defend themselves on the trial, be» cause they were ignorant of tiie existence of such testi-mony> which was out of their réach. And the defendant at law cannot be said to have submitted to a trial, ^[improperly, when they might have filed a bill in Equity, and have discovered the facts on the oath of the defendants 5 for he had no information which could lead him to an opinion, that notwithstanding tho appearance of the transactions between L» S. and F. and Tracy, there was a secret understanding different from the ostensible case, and that in reality L. S. and F. were mere agents and had no Solid interest in the conti*acts-assigned.
Indeed if the objection were valid to the full extent that a party shall be precluded from redress in this Court,, if he submits to a tidal at law, Where he might have filed a bill of discovery, and obtained important facts from defendant’s answer on oath, it would cut up this branch of remedial justice by tho roots, or compel every defendant at law to file a bill of discovery in the first instance. •
Upon the whole, I think the new testimony makes a fit case for the interposition of this Court, to give the complainants an opportunity to try what effect this testimony discovered since tho trial, ought to have upon the cause.
We come now to the great point, whether the case-made out upon the introducton of the whole of the testimony entitles the complainants in this cause to any and> what relief?
The strength of the argument on the part of the complainants may be summed up as follows.
A contract to be obligatory must be mutual, and there must be a consideration to make it valid ; else it is a nudum pactum. That in this case, L. S. and F. gave no value to W. T. and W. None is expressed on the face of the assignment or acceptance. None is proved or pretended in the defendant’s answer. That L. S. and: *327 F. gave nothing to Tracy to induce the assignment, neither a new credit, or forbearance for' old debts. They do not pretend it in their answer. And it appeared by the account current now produced in testimony, that though the assignment was made in November; 1785, L. S. and F. continued tq urge and receive payments from Tracy in all manner of ways, by bonds, bills, lands, houses,, wharves, ships, brigs and fishing schooners, through the whole of the year 1786, so that his debt was immensely diminished.
That the original contract between W. T. and W. and L. S. and F. expressly stipxdated that the funds Should be furnished by Tracy. It was the basis of the whole contract.
This was as all fair contracts should be, mutual. Bo you agree to furnish the fund in time, and I will purchase and remit the rice.
That all the papers signed by the same parties, in relation to the same subject, form but one contract.'
That in all probability Mr. Dickinson, the agent of Lane, Son and Fraser, knew the whole extent and terms of the contract; he was on the spot and knew all the -parties. He knew that he furnished no funds, and must have understood that they were to be furnished by Tracy. As agent of L. S. and F. he was acquainted with Tracy’s affairs, and knew he could not advance all the money at once. And that the acceptances were made conformably to, and dependant upon the contract with Tracy. That Tracy could only assign his interests in papers not negotiable, subject to all the equity W. T. and W. might have against him. The papers signed by Winthrop shewed but one side of the contract: he knew there must be another. That Tracy did not furnish the funds or very inadequately; and he directed an. appropriation of great part of what he did furnish to a purpose different from the original destination, which direction W. T. and W. obeyed, under the impression that Tracy was really the person interested, and had a *328 rígbí to give such orders. They had no temptation to l)avc done, so, unless they thought it right.
That >Y. T. and W. had large discounts against Tra* cy, to more indeed than the amount of his advances X and that the right to discount remains unimpeached. That there was in reality no new assumpsit to L. S. and F. The original agreement was to ship the rice to L. S. and F. and the acceptance was only a confirmation of the agreement. It was in substance a renewal of it, without any abandonment of the reciprocal engagement to furnish the funds. That the pretence of a new contract and assumpsit to L. S. and F. by which W. T. and W. are said to have become bound to them, at all events, even if no funds were furnished, is entirely unfounded. They had no inducement to do so ; no consideration moving them to it. And the facts disclosed by the evidence shews that it was not so understood by the parties, for L. S. and F. gave no credit to Tracy for the a-rnount. They made no debit to W. T. and W. As remittances were made, they gave credit not to W. T. and W. which they .should have done, if they considered them as their debtors under a new contract; but to Tracy.
That this was further shewn by the proofs, and the confession of the answer, that the shipments were to be at the risk and on the account of Tracy. And if profits were made, Tracy was to have the benefit of them.
That this was still further evidenced by the conduct of all parties. Tracy continues to controul and direct, and even claims damages of W. T. and W. (in one of his letters) for not shipping the rice in time. And L* S. and F. gave no orders ; received the remittances as made on the account of Tracy, and make no objection to the letters of W. T. and W. accompanying the remittances, and stating them to be on their contract with Tracy, on his account and risk.
Long after they speak of their business as of an affair depending, and give no credit to Tracy for the amount of rice contracted for by W. T. and W. That till the discovery of the evidence, part of which was ma- *329 toy years after the verdict at law, complainants had no ground to come into this Court. And since that, if there has been delay, it has been mutual; and no more blame attaches to one party than the other.
That even admitting the decision at law to have been right, on the facts disclosed at the trial, the new evidence not in the power of complainants, but discovered since the trial, makes an entire new case, which entitles complainants to relief.
On the other hand, the strength of the argument on the part of the defendants, may be summed up as follows. That a voluntary engagement imposes a moral obligation, which courts of justice will enforce, and such engagements cannot be said to be nudum pactum.-That in this case, W. T. and W. voluntarily accepted the assignments made to L. S. and F. and promised to deliver the rice to L. S. and F. or order. That this was a new contract with L. S. and F. Else why the formality of an acceptance, if it were not so intended, for the first contract was sufficient for all Tracy’s purposes. Their acceptances were to bind them to L. S. and F. That if the original contracts were mutual and dependant, W. T. and W. had a right to make a new contract, and to wave their right to insist on Tracy’s furnishing the fund as a preliminary. And that in fact their acceptance is a waver and formed a new contract, not subject to the original equity, which W. T. and W. had against Tracy. But that the agent of the defendants did not know of the counter engagement of Tracy to furnish the funds, the same not being apparent on the face of the contract, and no proof that he had any knowledge.
That the conduct of L. S. and F. in not controlling the proceedings, and in not giving credit to Tracy to the amount of the 1700 barrels of rice, and in not debiting \V. T. and W. was not at all inconsistent with the idea of & new contract, and a new engagement by W. T. and W, with L. S. F. for it is common for cred- *330 itoi’S'to take assignments of paper from their' debtors as collateral security and without releasing them.
That as the shipments were to be on account and at the risk of Tracy, this entitled him to have the profits , , . r if any, and to sustain any losses on the shipments.
That even if the obligation on Tracy to furnish the ..funds, as a preliminary to the shipment of the rice, is ' to have any influence in the cause ; he did in fact fur-^irish funds adequate or nearly so, to that purpose. And that W. T. and W. ought not after their acceptances to ship the rice to L. S. and F. to have obeyed the orders of Tracy, to appropriate the funds to any other purpose. And having done so, they have made themselves liable. Finally that this very question was examined and decided by th'e court of law, which was competent to .the case, and that judgment ought to be conclusive ; more especially as. the-new-evidence did not essentially vary the j ustice of the cause. Thatthe real tim e of the discovery of the new evidence is uncertain ; but certainly has been of long standing. And the party might have obtained the same testimony by commissions properly issued and directed previous to the trial at law. And no person can be.permittcd to come into this Court to got the benefit of testimony which he might ' by due diligence have obtained and used at law.
I have weighed the evidence produced in this cause, and the-arguments founded on it with anxious attention.
It is not my intention, nor is it necessary after the full statement I have made, to travel over all the.grounds taken by the counsel. It appears to me, that from what appeared to the Court on the trial at law, the decision •was correct.
The. action was brought on the acceptances of W. T. and \Y. and it certainly appeared to form a new contract, which obliged W. T. and W. to ship the rice (without any reserve as to funds) to L. S. and F. Nor was there any clear proof to shew that L. S. and F. or 'their agent knew of the existence of a counterpart to the *331 contract, by which Tracy bound himself to furnish funds in time to purchase the rice.
Nor were there any strong circumstances disclosed to shew that notwithstanding the- appearances of a real-and complete transfer to L. S. and F. they were in reality only agents of Tracy; and had only a collateral interest. But it does appear to me that the evidence now produced in this' cause, which I-have before stated 'fully, does-make a new case, essentially different from the former,. entitling \Y. T. and \Y. to some relief from this court.. That evidence-was not in the power or possession of the complainant, ft was in the -knowledge of the defendants and lias been discovered by complainants long since the triak They or-their agent knew, (and his- knowledge is theirs) that the-roceipt he had given to Tracy for the obligations ofW. T. and W. did expressly declare-that tliough the shipments- of rice, were, to be made in the name and apparently on account and risk of L. S. and F. they were nevertheless to be on the account and at the risk of Tracy.
So the account current in conformity to this receipt gave no credit to Tracy for the amount of the 1 TOO; barrels of rice, but states it as depending, and gives Tracy credit for the actual amount of shipments. And above all, the answer acknowledges that no debit was ever made to W. T. and \Y. of the the amount of the rice which it is contended they had entered into a new contract with L. S. and F. to ship to them; nor do they credit them-with the remittances. It may be true as it has been contended that a creditor may take collateral securities from his debtor, without giving the debtor credit for the amount of those sureties. But it certainly is extraordinary that the creditor should take a new obligation from the collateral surety, which be contends-forms-a new contract, and yet never debit him under that new contract. It furnishes at least-a very strong presumption that the creditors L. S. ánd F. did not consider this as an original absolute engagement to them-,, and a total abandonment and waver by >Y. T.. and W-, *332 of tho contract with Tracy, by which the funds were to be furnished in time to purchase the rice.
And all the other acts of the parties, Tracy, Bickin-80515 -k* S. ar>d F. and W. T. and W. tend to strengthen this presumption. I need not recapitulate these acts* have been sufficiently dwelt upon before.
It is a fact indisputably established, that the shipments to be made, by W. T. and W. were to be made .(notwithstanding the acceptances) on the account and risk of Tracy. This is usually made the test of ownership. It is so in many transactions. In a case in 4th Dallas, p. 155, it is decided that where a creditor refuses to take and remit a bill of exchange in absolute payment, and on his own account and risk, though his debtor endorsed and delivered it to him, the ownership remains with the debtor, and he shall be entitled to the damages on the return of the bill protested. The endorsement and delivery of the bill to the creditors gave the transaction the appearance of a complete transfer. But the proofs in the cause shewed that though the bill was endorsed, it was not received as an absolute transfer, but remained at the risk and on the account of the debtor. And this decided the cause, and entitled him to the amount of the bill and the damages.
In the case under our consideration, the acceptances gave at first sight the'appearance of an absolute transfer at the risk and on the account of L. S. and F. But the new proofs in the cause shewn that this was most sedulously avoided, and that the receipt of Mr. Dickinson for the obligations of W. T. and W. most explicitly.de-declares the shipments were to be on the account and at the risk of Tracy. And the subsequent conduct of the parties corresponds with this.
Viewing the case in this light, and strongly impressed with the idea that the abstract justice of this case is with the complainants, inasmuch as they received no consideration upon the acceptanc.ees, and as L. S. and F. the defendants, paid no price, and gave no forbearance even to Tracy for these acceptances, I am very strongly *333 disposed to pronounce that these acceptances as explained by the new testimony, were not so absolute as to make W. T. and W. liable beyond the funds furnished according to the contract between them and Tracy. I think the justice of the case clear to that'extent. But I have great doubts on another point 5 'that is, whether the complainants ought to be let in to diminish their liability below the extent of the fund actually furnished by Tracy, by shewing that he had changed the application of part of thé fund to another purpose.
It was indeed insisted upon by the counsel for the complainant, that if the court should be of opinion that the acceptances were not absolute, but that the evidence limited thegenerality of the acceptancesto the amount of the funds actually furnished by Tracy, then it followed of course that complainants could be let into all the demands they had against Tracy to set off against those funds. But it does not strike me that this is a necessary consequence. We are seeking the very justice of this case. Upon that principle I restrain the liability of complainants on the acceptances, to the amount of the fund furnished. Upon the same principle I think that as the complainants knew that L. S. and F. had an interest in the application of whatever funds were actually sent by Tracy to W. T. and TV. for the purchase of the rice in question, under the contract, and they had agreed by their acceptances to such application for the benefit of L. S. and F. they were in the wrong to obey any directions of Tracy, which went to change the application of the funds.
I should be unwilling however to decide this point myself. I would rather direct that an issue should be made up for the trial of this point before a jury.*
It is therefore ordered and directed, that if the parties desire it, an issue be made up to. try the question above-mentioned before a jury.
*334 This cause was very fully argued at the last Court1* an(l I gave a decree upon the principal points.
A doubt however remaining on my mind on one qties-^01'5 wished to have directed an issue, and made an offer to the parties to do so 5 for I was very desirous to avoid deciding upon a question of this kind. This offer the parties declined, and though I greatly regretted this, * did no^ c^oose to direct the issue without their assent, because of the great length of time which has already elapsed since this cause was pending. I then directed a further argument upon the point whereon I doubted. That argument has taken place, and I have considered the question very maturely.
I had decided at first, that under all the circumstances of this case, I did not think the acceptances or engagements of Winthrop, Todd and Winthrop, at Tracy’s instance, to Lane, Son and Fraser, were such as would render them accountable beyond the amount of the funds furnished by Tracy. But I was inclined to think that they were bound to the extent of those funds * and that they had done wrong to obey any directions of Tracy which went to change the application- of the fund *335 and to make remittances to France, instead of skipping rice to'Lane, Son and Fraser. I am now to gire my opinion upon this point, on the second argument. Although the counsel took a much wider range in the argument, than the point reserved, and in some degree went over the questions already decided, I shall coniine my remarks to that alone, on which I doubted.
it was insisted for the complainant that the assignee takes the assignment with all the equity which the obli-gor had against the obligee ; and that in this case, Lane, Son and Fraser, could not be allowed to take any benefit, as assignee, whilst the obligors, W. T. and W. had any demands against Tracy, the assignor. And the case of Da Costa against Shrewsbury, reported by Mr. Justice Bay, in his first-volume, was said to have established that doctrine.
It is no doubt very true both at law and in equity, that the assignee does take the thing assigned subject to the equity which the obligor has against the obligee.
But the very cases which lay down that doctrine, say that many circumstances may vary it. And the later Gases seem to put it on this ground, that the assignee *336 shall take subject to all the equity, which the obligor had ^16 ^me the assignment, or at the time of notice of the assignment. And strong as the case of Da Cos-^a'v* Shrewsbury is in favor of the obligor and against the assignee, (and there cannot well be a stronger, for the obligor had been consulted by the purchaser, and had agreed that the holder of his bond should assign it; still the Court relieved him,) yet that case does not go beyond the limit above mentioned; for though the obli-gor was ignorant of the equity, which he had at the time he assented to the assignment; yet there existed an equity at the very time, to wit, the bad title to the land, for which he had given the bond in question. When that fact was discovered it had relation back to the origin of the contract, and he was let into that defence against the assignee, to whom he had consented that he might take the assignment. This is what has been done by the decree already given in this case ; for the complainants have been let in to shew that though they made acceptances on the back of their contract with Tracy in favor of L. S. and F. they did so unquestionably, with a view to certain funds which Tracy by a corresponding and mutual contract agreed to furnish, and the opinion of the Court restrained their liability to the extent of the funds actually furnished by Tracy, though the parties, Winthrop, Todd and Winthrop, had been so unguarded as to make acceptances without an express reservation on that point. But equity made an implied reservation for them, under the peculiar circumstances of the case.
I am not by any means certain that the Court could have ventured to have gone even as far as it did, if there had been any proof that Lane, Son and Fraser had given any new credit to Tracy, or had even extended the* time of payment of his debt to him ; or had in any way done any act, or been endangered by the acceptance of Winthrop, Todd and Winthrop. No such proof appeared, and the Court gladly protected the parties as far ass it was in its power.
*337 But the Court is now asked to go much further. It is asked to let in the complainant, to set up discounts, which arise from shipments made by Winthrop, Todd and Winthrop, to France, by the direction, and on account of Tracy, against the demand which Lane, Son and Fraser set up to have a performance of the contract with Tracy, assigned to them by the consent of Winthrop, Todd and Winthrop, themselves j which shipments to France were made long subsequent to the con-trae with Tracy, and to the assignment by him to Lane, Son and Fraser, and the acceptances of W. T. and W.
It was very properly observed by the counsel for the defendant that this was a very distinct question. That it was asking the court to let the complainant set up matters of discount, which were subsequent to the assignment and acceptances, and upon grounds entirely supervenient, to wit: the advances made by Messrs. Winthrop, Todd and Winthrop, to make remittances to France for Tracy 5 and surely this would be going too far. It was optional with Winthrop, Todd and Winthrep to have obeyed Tracy’s injunctions, to remit to France or not. They were not bound to make such remittances by any contract, or by any acceptances, to any French houses. Nor does Tracy appear to have substituted the one for the other 5 for there is no proof that he counter ordered any shipment to Lane, Son and Fraser, in order to make this shipment to France.
It would rather seem that he continued to urge the remittances to Lane, Son and Fraser, conformably to the engagements made. Now if Winthrop, Todd and Winthrop, had not received funds to perform both, they should have done that, which they had undertaken to do to third persons; and not what was optional with them to perform or not at their pleasure. Besides it would seem that Tracy held out to Winthrop Todd and Winthrop, another fund to induce the shipments to France, to wit: the accceptance of bills of exchange to be drawn by Winthrop, Todd and Winthrop, on a house of credit at Philadelphia. And it appears that Winthrop^ Todd *338 and Winthrop made the remittance to France on that ground. It is true that they w'ere cruelly deceived and disappointed by Tracy, who afterwards forbade his Philadelphia to pay the bills. And if Tracy alone were concerned there could be little doubt where ^1C justice of the case would lie, and as little of the inclination of the Court to give relief adapted to the case.
Indeed it was insisted from the complainant that this was really the fact, that Tracy alone was concerned, and that Lane, Son and Fraser had no interest in this assignment, and. in the shipments contracted to be made by Winthrop, Todd and Winthrop, with Tracy. That they were agents of Tracy. That the shipments being to be made at the risk,, and on the account of Tracy, proved this $. and that the conduct of Tracy in control-ing and regulating -the shipments j and the conduct of Lane, Son & Fraser-in acquiescing in his arrangements, supported tbat proof, Consequently -the acceptance or agreement of Winthrop, Todd and Winthrop, with Lane, Soli a&d Fraser, being for the benefit of Tracy alone, they were-at-Iiberty to set up every demand they had against Tracy.
•It is true-that the shipmen-ts were to be made on the ■ account, and at the risk of Tracy to Lane, Son and Fraser. But when the remittances were received in safety, the.proceeds of them were to be carried by Lane, Son • and Fraser, to Tracy’s credit,' on a debt due by him. This is not uncommon among merchants. They are often willing to be paid by remittances -made by third .persons on account of their debtor j but not. to release their debtor till the remittance be actually made. Every tiling shall be at the risk of their debtor,, till the remittance is effected. But they still have an interest in the ■remittance, Suoh an one as I presume, would have Termed an insurable interest.
■It cannot then be said, that Lane, Son and Fraser had •no interest in these 'shipments. They certainly had, and were to give credit to Tracy, as soon as those remittances were made. The acceptances by Winthrop, *339 Todd and-Winthrop, were a pledge to tlipm that such remittances would be made to the extent of the funds to be furnished them.
With regard to Tracy’s control, and his giving directions to Winthrop, Todd and Winthrop, respecting the remittances, and with respect to the silence and ap. parent acquiescence of Lane, Son and Fraser, in the acts of Tracy ; the former resulted from the relative situation of the parties, and from the fact that the assignment of Winthrop, Todd and Winthrop’s contract with Tracy, and even their acceptances in favor of Lane, Son and Fraser had not induced them to release Tracy entirely. He therefore was interested in the compliance of Winthrop, Todd and Winthrop with the contract. As he was to furnish the funds to purchase, and the ships to carry the 1700 barrels of rice, and was resident in America, he necessarily gave the directions, But his directions, as was properly urged by the defendant’s counsel, were in affirmance, not in violation of the arrangements made between the three parties,. He orders the shipments to he made to Lane, Son and* Fra*. .ser, as has been agreed. He never says, take the funds • destined to enable you t,o remit to Lane, Son and Fraser, and make remittances-to France. He never sub* stituted-one for the other j at least we have-no proof of it. And if he relying upon the bills lie authorised Winr throp, Todd and Winthrop to draw, or upon their general confidence in him,, gave directions to them to. make some remittances to France $ there was no inconsistency in this. „ And Winthrop, Todd and Winthrop adhering to the engagements they had actually made, would have been under no obligation to go into the shipments to France, unless they were satisfied as to the funds to be furnished by Tracy for this new purpose.
Nor indeed is there any proof that Winthrop, Todd .and Winthrop, considered the direction to make a shipment to, France as a substitution for the shipments.to be made to Lane, Son and Fraser, for in such case we smcly would have heard of some remonstrances, or of *340 some explanations. They seem unhappily to have had too much confidence in a man, who did not deserve it j and to havé acted as he directed or desired, without, su®c^en^ precaution for their own security.
The claim of damages made by Tracy for the non compliance of Winthrop, Todd and Winthrop with their contract by making the stipulated shipments to Lane, Son and Fraser, certainly does not justify the conclusion drawn from it by complainants. It shews indeed that Tracy supposed that Lane, Son and Fraser had not accepted the assignment of Winthrop, Todd and Winthrop’s contract in full discharge of the debt due by him to them j but that they took it at least as a collateral security, and were to credit the amount of remittances to Tracy when received from Winthrop, Todd and Winthrop, and that meanwhile it was at his risk, to which Winthrop, Todd and Winthrop assented.
And though Lane, Son and Fraser were entitled to the remittances actually made, Tracy might pretend that he was entitled to damages for non performance, on the principle of the case of the bill of exchange cited from 4 Dallas, p. 155.
But the claim of Tracy to damages from Winthrop* Todd and Winthrop could not alter the rights of the parties, and could not take away the effect of the liability which Winthrop, Todd and Winthrop had voluntarily contracted with Lane, Son and Fraser, as far as that went, under the restrictions heretofore stated by the Court.
Reliance was placed on the acts of Lane, Son and Fraser, as if they had acquiesced in the conduct and acts of Tracy, asserting rights or powers of control over the application of the fund destined to support the remittances. I do not however perceive this. They have written no letters, made no declarations, nor have they done any acts, which would justify the idea that they meant to relinquish the interest they had in the assignment, or which could mislead Winthrop, Todd- and Winthrop into a belief that they consented to a relin *341 quishment of the fund, or to the employment of it in any other way than in remittances to them.
> It is said they were silent when Winthrop, Todd and Winthrop made them a remittance, and told them it was by the direction, and on the account of Tracy. If this were so, then their silence was an acquiescence in an act, which was in part performance of the contract, and of the arrangements made. This was no waiver of their rights $ and there is no evidence before me, that they ever did waive their rights to the proceeds of those funds, whatever they might be.
It was contended that the contract between Lane, Son and Fraser and Winthrop, Todd and Winthrop was without consideration, and was a mere nudum pactum, not',binding on them. The doctrine of nudum pactum is of some difficulty. Different nations have different regulations on the subject. The civil law differs from our law. The subject is well discussed in the case of Pillans v. Van Mierop, 3, Burr, 1670, and in a note to the case of Rann and Hughes, 7 term rep. 850. And it seems to be now established that a consideration of some sort is necessary to support an agreement, though evidenced by writing, unless the writing be of the solemnity of a deed or bond, or unless it be negotiable, or unless third persons have become interested with the knowledge or approbation of the person engaging to do a particular thing, or to pay money.
There is a distinction between a mere voluntary promise, and one upon the faith of which another does some act, or enters into some engagement. See Crossby v. M’Dowall, 13 Vesey, jr. 147, 158, cited by defendant’s couns'el. .
In the. case under consideration, Tracy, who was in-, debted to Lane, Son and Fraser, (as appears by the accounts produced in evidence by the complainant, as newly discovered, evidence,) proposes to make them remittances through Winthrop, Todd and Winthrop, who in consideration of Tracy’s contracting to furnish them proper funds, engage to make the remittances. And *342 this engagement is assigned with their consent to Lane, Son and Fraser, who certainly must have counted on it j ^eas^ as an additional security to their debt, so far as Tracy had furnished, or should furnish funds.
And in fact he had actually furnished funds to a considerable amount at the time of the assignment and acceptance.
X’eally cannot under these circumstances consider this acceptance by Winthrop, Todd and Winthrop to Lane, Son and Fraser as a nudum pactum.
Nor do I think it necessary for Lane, Son and Fraser to prove actual indulgence or new credit given Tracy in consequence of this engagement of W. T. and W.
It was further insisted that to relieve the complainants from the whole extent now demanded, followed as a necessary consequence from the relief already given by the opinion of the Court restricting the liability of Winthrop, Todd and Winthrop to the funds actually furnished by Tracy. After mature consideration I cannot see it in that light. It appears to me there was strong equitable ground to restrain the liability to the amount of the fund. But that Winthrop, Todd and Winthrop were bound to apply'the fund as far as they received it, undeviatingly to the object stipulated in their contract with Tracy, which was assigned to Lane, Son and Fraser, and acceptances made by them to Lane, Son and Fraser.
I cannot relieve them from the consequences of their employing part of that fund to any other purpose than that they engaged to do. i
I cannot by any effort of mind, however strongly inclined, go with the complainants the length I am ask-e.d to do. But I may be in' error, and I shall be glad that both the decrees made in this case should be carried up to the tribunal where the errors may be corrected. It would be grateful to me, if that tribunal could feel itself justified in giving greater relief to the.complainants.
It is ordered and decreed that the injunction on the judgment at law be continued till the. further order -of *343 the complainants, and that the complainants do account with the defendants for the funds placed in their hands by Tracy, for the purpose of making remittances to Lane, Son and Fraser.
From this decree there was an appeal.
1. Because no new contract was made between com-' plainant and defendant, and no consideration in law or equity existed whereon a new contract could be predicated.
2. Because the decree having admitted that defendants, the assignees of N. Tracy, took the assignment o^ the contract in question with all the equity which the obligor had against the obligee, nevertheless has declared complainants accountable to said assignee for the ac~. tual amount of the funds furnished by the assignor, although those funds were by the said assignor expressly diverted to other objects, without the interference of or any notice to the contrary by the assignees who by suffering the whole business of the contract to remain in the hands of the assignor thereby made him their agent and they are consequently bound by his acts.
3. Because it clearly appeared from all the documents' produced at the hearing of the cause, that from the commencement of the operation of the contract until after the said alleged diverson of the funds, no privity of contract whatever subsisted between the obligor and the assignee, but continued throughout with the obligee and was so considered by the assignee.
4. Because from the very nature and circumstance? .of the case it was competent to the said N. Tracy the obligee to make such diversion, and order such changd as to the application of the said funds as to him should seem proper, and the defendants having trusted Tracy solely to manage the contract, ought to be held to look to him and to him alone for any damage or injury accru-to them therefrom, and because it was competent to and was the duty of complainants to pursue such orders as they should receive from Tracy relative to the said appropriation, the contract being with him alone.
*343 Let it be referred to the master to examine and report what funds were so placed in the hands of Winthrop, Todd and Winthrop, and what is now due by them on those funds, after deducting the remittances actually made by Winthrop, Todd and Winthrop to Lane, Son and Fraser.
HeNKy Wmi am Desaussvre.
October 15, 1811.
5. Because nothing had intervened between the signing of the original contract with Tracy and the alleged diversion of said funds to create any new contract with Lane, Son and Fraser, and which could restrain complainants from pursuing the directions of Tracy, inasmuch as the acceptance by complainants only bound them to consign to defendants such rice as should be ordered by Tracy to be shipped to London with funds specially furnished and destined to that object by Tracy, and it appears from some of the documents aforesaid that this was the understanding of all the parties.
6. Because the funds applied to the purchase of the cargoes they sent to France were raised by and furnished out of the resources of complainant in the first instance on the faith of credit, being provided in Philadelphia by Tracy for bills to be drawn by complainants, who were led to regard that as one of the modes he had adopted to supply funds for the purchase of rice; and there was nothing in the original contract whereby any particular mode of supplying funds was designated, and therefore they had a right to charge those shipments to France to the general debit of shipments made, and the defendants can take no benefit from the assignment without allowing all disbursements on account of the contract the assignee taking the thing assigned subject to all the equity which the obligor has against the assignee, and is not in this case, and under its peculiar circumstances, confined to the equity which the obligor had at the time of notice of the assignment; the assignment not having changed or transferred the contract, but being a mere modification of the original contract, as to the ship- , ° r
7. Because it did not appear at the hearing that defendants had in consequence of the assignment, given any new credit to Tracy, or had extended to him the time of payment of his debt or had in any way done any act or been endangered by the acceptance of complainants ; on the contrary, it clearly appeared that defendants, continued to look to Tracy alone for the payment of his debt, and in every respect acted as if no assignment had been made or as if they considered the acceptance by complainants as nothing more than a mere promise to consign to them in preference such cargoes of rice as should be shipped to London.
8. Because the directions of Tracy, (who had alone with the acquiescence of defendants, the management of the contract,) to divert the funds, or create new ones for the shipment to France, were a virtual countermanding of the shipment to London, and the conduct of defendants substantially authorised Tracy to make such alteration in the shipments, and the advances were made by complainants by order of Tracy to further this shipment, and because it does not appear that it was known to defendants that these funds to be shipped to France were not ultimately destined for defendants, and that the said shipment was a more advantageous mode of making the remittance.
Smith & Bacot, compl’ts sols.
The appeal was heard, and the Court of Appeals, present Chancellors Thompson, Desaussure, iard and Waties, made the following order, unanimously :
« The decree is affirmed, for the reasons therein assigned.”
The cause was argued by Messrs. W. L. Smith, Parker and T. Ford, for the complainants.
And by Mr. Pringle, for the defendant.

 One of the principal grounds of the equity jurisdiction, is the power of granting injunctions, and staying proceedings at law. Its origin is very ancient, ascending to a period anterior to the time of Sir Thos. Moore, who exercised this power frequently. In the year 1616, a dispute arose between the Courts of Law and Equity, whether the Court of Chancery could give relief against a judgment at law, which was decided in favor of the Court of Chancery, and it has been acquiesced in ever since. 3 Bla. Com. 54; 1 Woodeson’s Cts p. 186. There are numberless cases which may render it against conscience to prosecute an action at law. See 1 Vernon, 489, 490; 1 Ves. 396; 3 Woodeson, 409, 407; 1 P. Wms. 671; and proceedings may be stayed by injunction in another Court of Equity, if inferior; or in the admiralty, or ecclesiastical courts. 3 Woodes, 410; 1 Atk. 628; 3 Atk. 350, note, 2 Fonbl. 322; 1 Ves. 119, 284. Butthispower is exercised with caution, and on certain general principles. The Court óf Chancery will not interfere after verdict and judgment at law, unless in cases of fraud, surprise or extraordinary cases, where manifest injustice has been done. Nor where the party might have defended himself fully at law, & neglected it. But it will give relief in all cases (not of a criminal nature) of fraud, surprise, or extraordinary cases where complete justice has not been done; and in many cases on principles of general policy. See 2 Atk. 190, 319; 1 Atk. 268; 3 Atk. 223,4 ; 2P. Wms. 424 ; 3 F. Wms. 395 ; 2 Ves. jr. 135 ; 10 Ves. 422 ; 6Bro. P. C. 470 ; 1 Schoals and Lefroy, 201, Bateman v, Willoe; 2 Hen. and Mum, 170-

 The Court does not feel itself bound to direct issues even in cases desired by one of the parties, (except in cases relating to the due execution of wills of real estate,) but it frequently directs them to satisfy its *334 Conscience, on disputed facts. I.ord Chancellor Eldon said, “ there is no-doubt that according to the Constitution of the Court of Chancery, it may take to itself the decision of every fact put iu issue upon the record.” In the case then under his consideration he directed an issue,, saying, “it is enough for me that I cannot unravel the difficulty, »o as to satisfy myself.” O’Connor v. Cook, 6 Ves. 671, 3. See also, the War. denof S. Pauls v. Morris, 9 Ves. 155, 162, 8. See too the course clearly laid down in the case of Jervis v. White, 7 Ves. 413, 415. The Court, of Chancery directs or refuses new trials in its discretion. See Coker v. Farewell, 2 P. Wms. 563 ; and the object of issues out of Chancery being only to inform the conscience of the Court, the Chancellor is not tied down to the same strictness and regard for verdicts, as courts of common law. Richards v.Symes, 2 Atk. 319. Issues are not sent of course. The Court judges of the propriety in each case. In the great Case of Fox v. Mackreth, Lord Chancellor Thurlow was pressed to grant issues, but refused. He said it would be sending to a jury, not matters of fact, but what ought to be the rules and principles of a Court of Equity. See 2 Bro, C. C. 400, fee. and Lord Chan. Redesdale thought he-was right to refuse. See 2 Shoals andLefroy, 669. Lord Chan. Cowper refused to direct an issue, in a case where if the fact to be proved were *335 •established, it would operate as a forfeiture on one of the parties. See Vane v. Fletcher ; 1 P. Wras. 353. See also, 5 Bro. P. C. 454, and 6 'Bro. P. C. 197". By all which it is established that issues are not directed ot course, or of right. The court of law, to which the issue is directed, adheres to legal evidence, unless otherwise directed by this Court.. See the Warden of S. Pauls v. Morris, 9 Ves. 155, 162. The rule is laid down that in deciding between the evidence of a single witness, and the answer of the defendant contradicting him, circumstances are looked to, and if they turn the scales, the Court may decree or direct an issue to try the fact. L’dChan. Eldon explains the grounds on which issues in auch cases are sent. See East Ind. Comp. v. Donald, 9 Vesey, 275,283,45. See 2 Atk. 19,140; 3 Atfc. 177, 469, 407; 1 Ves. 66, 97, 125; 1 Bro. C. C. 52, and Evans v. Bickngll, 6 Ves. 174, 7, where the cases are collected. See the various cases in which the Court of Chancery will direct issues or refuse them, collected in the general index to Brown’s P. C. at the end of the 7th vol. under title “ Issue,” and see 6 Bro. P, C. 501; but there ape many other cases stat«4 in file later reports. '